Filed 3/3/16  In re P.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.B., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E063415 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1300959) |
| v. | OPINION |
| L.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.

Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and

Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Guy B. Pittman, and

Carole Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

1

This dependency proceeding involves P.B., who was three years old when the juvenile court removed her from her mother and father and granted both parents reunification services. At the 12-month review hearing, the court terminated services as to appellant mother (L.S.), continued services as to father (J.B.) until the 18-month review hearing, and did not set a permanency and planning hearing under Welfare and Institutions Code section 366.26.[1]

Mother appeals the court's decision to terminate her reunification services.[2] Her sole argument is that the court abused its discretion by failing to rely on the opinion of one of the psychologists who had evaluated her during the proceedings. This argument lacks merit because the record demonstrates that the court did consider the psychologist's opinion and, further, that the psychologist was unable to recommend continuing reunification services. The psychologist's opinion, together with the other evidence and information discussed below, reasonably supports termination of services. We therefore find no abuse of discretion and affirm.

---

[1] See, e.g., *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 877; *In re Alanna A.* (2005) 135 Cal.App.4th 555, 559 (court has discretion at 12-month review hearing involving child over the age of three to terminate reunification for one parent while continuing services to the other parent to the 18-month hearing).

[2] Father is not a party to this appeal.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Facts Leading to P.B.'s Removal*

P.B. came to the attention of respondent Riverside County Department of Public Social Services (DPSS) in December 2013, when mother exhibited bizarre and erratic behavior during a hospital visit for P.B.  On December 6, 2013, mother brought P.B. to the Rancho Springs Medical Center.  According to the reporting party and later confirmed by medical staff, P.B. was running a fever, but staff were unable to diagnose her because mother was not cooperative with treatment.  Mother would not allow staff to place a catheter in P.B., stating that P.B. would no longer be a virgin.  Staff attempted to explain why a catheter was necessary, but mother appeared not to comprehend.  Mother also appeared to be hearing voices.  She spoke to these voices in Spanish and another, unidentified, language.[3]

Mother carried a Bible with her and prayed for a long period of time.  When she opened her eyes she said, "God will protect her; God told me she will be ok, and this is not for her."  Mother was given a prescription for an antibiotic, but she did not want any medication for P.B.  The reporting party was concerned that mother would not follow

---

[3] Mother was born and raised in a rural village near Oaxaca, Mexico, where the residents speak Spanish and an Indian dialect.  This dialect may have been the unidentified language medical staff heard her speaking at the hospital.

through with obtaining the medication.  Staff suspected mother might have schizophrenia or undiagnosed mental health issues.  Ultimately, a security guard escorted mother from the hospital due to her strange behavior.

The reporting party alleged that, after leaving the hospital, mother "got into a bathtub full of water, and fully clothed with the child."  Shortly thereafter, someone called 911.  Mother was taken to the hospital and placed under a 72-hour involuntary psychiatric hold.

A Spanish-speaking DPSS social worker visited mother at the hospital.  She interviewed mother in Spanish because mother indicated it was her preferred language.  Mother said she was in the hospital because she was tired and stressed, but she was calm now.  She did not remember where her daughter was.  She thought P.B. might be in Oaxaca, Mexico, with either father or her friend, M.M.  She could not remember how long she had known M.M. or where M.M. lived.  She also did not know the address where she herself was living.

The social worker asked if mother had been hearing voices, and mother responded, "[t]hey are talking all the time."  The voices would say, "Give me your daughter."  The voices would also tell mother to kill herself, but mother stated, "I only listen when they say, 'Give me your daughter.' "  Mother had contemplated suicide in the past, when she was single.  Mother reported that she had been married to father for two years.  They were currently separated and she did not know his whereabouts.

4

Mother also reported she had been hospitalized in the summer of 2013. She had been diagnosed with schizophrenia and prescribed medication. The medication made the voices go away, but she had run out of medication.

Mother was ultimately able to remember the phone number of her friend, M.M. The social worker visited M.M. at her home in Temecula. M.M. had been caring for P.B. while mother was in the hospital. She had picked up P.B.'s antibiotics and was administering them with Tylenol as directed by the doctor.

During her interview with the social worker, M.M. explained that she had known mother for six years. In the past, M.M. and her husband had let mother live with them and had taken care of her. Mother met father at the McDonald's where they both worked. Father left when mother was pregnant with P.B., and mother became distraught and suicidal. M.M. taught mother how to care for P.B. and found her a place to live. At some point, mother and father got married and M.M. had no contact with mother for two years.

Mother reconnected with M.M. in July 2013. She told M.M. that during the past two years she had been living in Hemet in a home where there were drugs and pornography. M.M. could see that mother was mentally ill. Mother was hearing voices and talking "nonsense." She told M.M. she had not slept for 10 days and could barely care for P.B. Around that time (July 2013), M.M. took mother to the hospital and the staff placed her on a three-day hold. Mother was diagnosed with schizophrenia and

prescribed medication. She stayed with M.M. for a couple of weeks after leaving the hospital.

DPSS placed P.B. in M.M.'s custody and care. On December 10, 2013, DPSS filed a Welfare and Institutions Code section 300[4] petition on behalf of P.B. As relevant here, the petition alleged that mother's unresolved mental health condition and refusal to comply with medical staff's recommendations to reduce P.B.'s high fever placed P.B. at a risk of physical harm under section 300, subdivision (b). On December 11, 2013, the court detained P.B. as to both mother and father.[5]

About a week later, the social worker interviewed mother's case manager at Canyon Ridge Hospital. Mother had been hospitalized from December 7, 2013 to December 13, 2013. She had been diagnosed with psychotic disorder and prescribed Zyprexa.

At the jurisdiction and disposition hearing on February 5, 2014, the court found true the section 300, subdivision (b) allegations against mother. The court ordered P.B. removed from mother's and father's custody and ordered DPSS to provide both parents family reunification services. Under her case plan, mother agreed to obtain psychological

---

[4] All unspecified statutory references are to the Welfare and Institutions Code.

[5] The jurisdictional allegations against father are not relevant to mother's appeal.

and psychotropic medication evaluations, attend counseling, and complete a parenting education program.

B.    *Post-removal*

As of early April 2014, mother was living with a friend in Temecula and had not obtained stable housing. She reported to the social worker that she was hearing voices and that they frightened her. She said praying and reading the Bible made her feel better. She agreed to see a doctor on April 21, 2014.

When the social worker spoke to mother on April 23, 2014, she had not yet seen a doctor. She was still hearing voices and was having trouble sleeping.

On May 14, 2014, a DPSS social service assistant took mother to a medication assessment. Mother was cooperative at the assessment, but was confused as to why P.B. had been taken away from her and why she had been told she was mentally ill. Mother did not consider herself mentally ill. She reported that she had been prescribed medication for schizophrenia in the past, but she no longer took it because she did not have schizophrenia. She explained that Jesus Christ was her doctor and she had gotten rid of schizophrenia through her saliva. The assistant observed that mother appeared to be responding to auditory hallucinations during the assessment.

On May 19, 2014, after a visit with P.B. at DPSS's Temecula office, mother ran in front of a car in an attempt to kill herself. Father stopped her and brought her into DPSS's office. Mother began to cry and told the social worker she planned to throw

7

herself into traffic or jump off a bridge. The social worker called 911, and mother was placed on a section 5150[6] hold.

DPSS's six-month status review report stated that mother was receiving treatment at Temecula Mental Health Clinic and had been diagnosed with schizophrenia, paranoid type. Mother reported she was receiving monthly intravenous injections of her psychotropic medication prescription, but she did not know what her prescription was.

According to DPSS's report, supervised visits were not going well. Mother was not engaging or bonding with P.B. The visits were often "hectic" if father was not also in attendance, and mother would ask P.B. why P.B. hated her.

P.B. was doing well in M.M.'s home and mother and father were happy with the placement because M.M. had been an active member of P.B.'s life. They believed M.M. would take good care of their daughter.

P.B. had severe dental decay and the doctor advised that dental surgery and general anesthesia were necessary. DPSS had to obtain authorization from the court to administer anesthesia because both parents would not agree to oral sedation.

At the six-month review hearing on August 5, 2014, the court ordered P.B. to remain in out-of-home placement and continued reunification services for both parents.

---

[6] Section 5150 allows for the involuntary hospitalization of a person who "as a result of a mental health disorder, is a danger to others, or to himself or herself." (§ 5150, subd. (a).)

DPSS's 12-month status review report stated that mother was still receiving monthly injections of antipsychotic medication. Mother told the social worker that she did not have mental health issues and was only compliant with her medication because DPSS had requested she follow her doctor's recommendations. Mother still had not found stable housing. She had resided in various locations with friends. She completed a parenting program at MFI Recovery Center in October 2014.

Mother regularly attended visits, but her interaction with P.B. remained limited. Mother often sat on the sofa while P.B. played by herself. P.B. was often verbally and physically aggressive with mother, and mother failed to redirect her. Once, mother left P.B. unattended in the visitation room while she went to the restroom. When she returned, she used her phone for the rest of the visit and P.B. played by herself.

P.B.'s therapist reported that visitation was stressful for P.B. and that P.B. was "work[ing] through emotional effects of feeling her mother does not listen to her during visitation." P.B. was continuing to do well in M.M.'s home, but she would experience emotional disturbances after extended visitation with her parents.

C.  *The Psychological Evaluations*

Mother was assessed by two court-appointed psychologists during the review period. She first met with Dr. Suiter in late January 2014. A Spanish translator was present for this evaluation and all of the tests were administered in Spanish.

9

Mother denied having any significant medical history. She told Dr. Suiter she had been hospitalized twice, once in July 2013 because she was having trouble sleeping and once in December 2013 because she was feeling nervous. She reported that she was prescribed an antipsychotic medication as a result of the December 2013 hospital visit, but she did not fill the prescription. She "strongly denied experiencing any symptoms of psychosis during that hospitalization."

Dr. Suiter concluded, based on mother's "presentation" during the evaluation, that nothing "preclude[d] her from being able to adequately care for a child." Dr. Suiter added that he believed there was "additional data that would be more revealing in terms of her history which was not provided." He believed there were "some significantly unanswered questions regarding [mother's] psychiatric hospitalizations which may then bring into question her reliability in describing those issues." He stressed that his opinion that mother could safely care for P.B. was "offered tentatively." He requested additional documentation from DPSS so he could prepare an addendum report if necessary.

DPSS provided Dr. Suiter with the jurisdiction/disposition report as well as medical records from mother's involuntary hospitalization in December 2013. In his addendum report dated November 1, 2014, Dr. Suiter revised his earlier tentative opinion. Based on the additional information, he found mother had "clearly withheld" information during her evaluation. He found her description of her mental health history and her relationship with father to be "a very significant distortion of her actual history." He also

10

found she had no insight into the nature of her mental disorder or need for psychotropic medication.

Dr. Suiter concluded mother had either intentionally deceived him or was suffering from delusional thought processes that he was not able to discern during the initial evaluation. He further concluded it would be "overtly detrimental" to return P.B. to mother's care. He suggested an additional psychological evaluation to allow mother an opportunity to relate her past history and her current circumstances.

At a status review hearing on February 5, 2015, the court ordered DPSS to provide mother with referrals for additional psychological evaluations. Dr. Garett evaluated mother on March 14, 2015. Mother told Dr. Garett she was currently taking monthly injections of medication but she did not know the name of the medication.

In his report, Dr. Garett noted mother was born and raised in an "extremely rural" area of Oaxaca, Mexico. He explained that because he had lived near Oaxaca and spent extensive time in villages similar to mother's village, he could "understand some of the limitations and mentality of an individual from that environment." He added, "[a]t best, her culture and the way she was raised, is markedly different from the modern world."

Dr. Garett found it clear from Dr. Suiter's report that mother "did not understand and cannot reasonably take psychological inventories which were designed originally in America." He stated, "I tested many individuals in Mexico so I prefer to use projective testing which gives me a deeper view of the individual themselves." Dr. Garett

11

performed a number of assessments on mother, including the Rorschach Ink Blot Test, Thematic Apperception Test, Forer Sentence Completion Test, and the Bender-Gestalt Visual Motor Test.

Based on his findings as well as Dr. Suiter's, Dr. Garett concluded mother "is an individual who is very poorly prepared to cope with her decision to move to the United States some eight years ago and who has been unable to function effectively here." He further concluded mother appeared to suffer from "Reactive Psychosis" and "major depress[ion]." He explained that mother's "religiosity and her using religion as a solution to all of her problems further promotes psychotic and unrealistic thinking."

Dr. Garett stated it was "difficult for [him] to determine" whether mother was capable of caring for P.B. He offered the following conditional conclusion: "[I]f [mother] can present to her social worker the ability to stabilize herself, comply with her counseling, and continue to show normalized behavior, the possibility of reunification should be considered." He added, "I think it is a decision of the people who see her on a regular basis whether she had normalized herself to the point at which she could regain her child."

D.      *Termination of Reunification Services at the 12-month Review Hearing*

In the reports submitted in advance of the 12-month status review hearing, the social worker recommended terminating mother's services. She opined that even though mother was compliant with her medication regime and no longer experienced

12

hallucinations, mother demonstrated a poor understanding of her mental health condition. She observed that mother continued to steadfastly deny having any mental health issues and did not know what medication she was taking. She explained, "[mother] is unable to affirm what medication she is prescribed, and with this alone, there is ongoing concern as to her understanding of her condition, her needs, and her ability to follow through with continued stabilization if she does not comprehend the basics of her mental health requirements long term."

The social worker also opined that mother had demonstrated poor parenting and limited interaction with P.B. during visits. Mother had completed her services, but the social worker did not believe mother had benefitted from them. The social worker believed there was "no likelihood that the child can be returned to the care of her mother by the eighteen month mark."

The court held the 12-month status review hearing on March 19, 2015. Mother's counsel submitted the following stipulated testimony: "[S]he currently is receiving treatment for mental health disorders in the form of shots. She asked the person giving the shot what the shots were for, and that person told her they were both for depression and schizophrenia."

After hearing testimony and argument, the court found mother would not benefit from additional reunification services. The court terminated mother's services and reduced her visitation with P.B. to two times a month. It explained the basis for its ruling

13

as follows: "[The] Court considered very heavily the fact that Dr. Suiter's latest evaluation and [mother's] stipulated testimony was not consistent with reunification. . . . [¶] And the court reviewed the social worker's report and considered the totality of mother's efforts as well as her mental state." The court continued reunification services as to father and set an 18-month status review hearing.

II

DISCUSSION

Mother contends the court committed an abuse of discretion by relying on Dr. Suiter's evaluation and failing to consider the opinion of Dr. Garett. Mother argues that Dr. Suiter was unable to understand or communicate with her, whereas Dr. Garett was, due to his familiarity with her background and upbringing. We find no abuse of discretion. Not only does the record reasonably support termination of services, but also the record demonstrates that the court did consider Dr. Garett's opinion and that Dr. Garett was unable to recommend additional reunification services at the time of his evaluation.

"Where, as here, the court continues one parent's services and does not set a section 366.26 hearing, it retains discretion to terminate the other (nonreunifying) parent's services. [Citations.] The parent seeking additional services has the burden of showing such an order would serve the child's best interests. [Citations.] In exercising its discretion, the court has 'the ability to evaluate whether the parent will utilize

14

additional services and whether those services would ultimately inure to the benefit of the minor.' [Citation.] We will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re Katelynn Y.*, *supra*, 209 Cal.App.4th at p. 881.)

This dependency proceeding began because mother's mental health issues prevented her from caring for her sick infant. During the course of DPSS's involvement with this family, mother was involuntarily hospitalized twice, expressed suicidal ideation, tried to commit suicide by running in front of a car, and reported hearing voices that told her to kill herself and hand over her daughter. Mother's mental health issues placed P.B. at significant risk of physical harm once (when P.B. had a high fever and mother refused treatment) and placed P.B. at a continued risk of physical and emotional harm.

Despite this risk, and despite being diagnosed with schizophrenia and prescribed antipsychotic medication, mother denied suffering from mental health issues. She did not know which medication she was taking and she told the social worker she was complying with her medication only to appease DPSS. Mother's behavior throughout the proceedings demonstrated either a refusal or an inability to acknowledge her mental health issues and the risk she posed to P.B. Additionally, the record contained evidence that mother was not paying attention to or bonding with P.B. during visits, and that the visits were negatively impacting P.B.

15

This evidence alone reasonably supports the court's decision to terminate services. However, this was not the only information before the court. The court also had the benefit of two professional psychological evaluations.

Contrary to mother's contention on appeal, *both* of these evaluations, not just Dr. Suiter's, supported termination of services. Dr. Suiter concluded that returning P.B. to mother's care would be overtly detrimental to P.B. because mother was either delusional or intentionally refusing to acknowledge her recent psychotic episodes and diagnosis. Unfortunately, Dr. Garett was also unable to recommend a continuation of reunification services. He believed mother should receive additional services *only if* she could "present to her social worker the ability to stabilize herself." He found it "difficult to determine" whether mother could safely care for P.B. and concluded that the individuals who see her on a regular basis should make that determination.

We also reject mother's contention that the court failed to consider Dr. Garett's opinion, because the record demonstrates otherwise. Before ruling on the issue of reunification services, the court noted that it had read Dr. Garett's report, and when providing the basis for its ruling, the court stated that it "reviewed the social worker's report" (which contained Dr. Garett's report) and "considered the totality of Mother's efforts *as well as her mental state*." (Italics added.)

16

Under these circumstances, the court could reasonably find that mother would not make use of continued services and, consequently, that services were not in P.B.'s best interest.  We therefore conclude there was no abuse of discretion.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

HOLLENHORST
        Acting P. J.

MILLER
        J.